to the people of the state of Oklahoma. Thank you for coming. The appellate state of Pursley defendant, attorney. I hereby order you on behalf of the defendant, attorney, Mr. Richard S. Coleman. I hereby order you on behalf of the defendant, attorney, Mr. Kevin J. Coleman. Mr. London. You may proceed. Thank you, your honors. May it please the court. I'm called. Richard London, on behalf of the people of the state of Illinois. Your honors, this is both simple and complex before you today. It's simple in that we're arguing that the judge's ruling below is manifestly erroneous. It's complex because ballistic testing is a pretty complicated science. I would actually say it's not a science, it's more of an art form or a craft. Very briefly, and contrary to the defense position, the people did briefly mention in their opening  previous arguments relating to the IBIS system is relevant and valid because exactly what the people predicted and what Judge McGraw had said last appeal occurred in this case, and that was submitting the evidence to the IBIS system led to nothing. Didn't bring out new evidence, it didn't bring out a new gun, it didn't disclose anything. All it led to was the defense requesting the right to reexamine the old evidence, which was granted. That is not... You say it wasn't new evidence, but I believe when the first tests were done, the magnification was around 20 power, is that correct? Magnification went up to 60 power at the time. So it doubled. Most of it was done at lower, and that's now where it starts getting to more complex. Well, isn't it new that it's at least twice to six times the magnification? Arguably. And why do I say arguably? I say arguably because... You ever play basketball? I have. You ever play against somebody that was twice your size? I have, indeed. What about one that was six times your size? The difference is that... You lose. Correct, except the difference is that in basketball, there's a definitive difference. Here, as even the defense expert Mr. Coleman stated, higher magnification of microscopic scratches can lead to a distortion not necessarily always a benefit. In this case, it's even more magnified, pun not intended, by the fact that we have two different kinds of marks. Isn't there also new evidence on that the testimony of the defense experts were different and new from what the original defense experts' testimony was? I believe that... That would not be really discovered. That literally... If you... If we were to have, ten years ago, different defense experts, they may or may not come to inclusion. But five years from now, if we were to say, wait a second, let's give a new IBIS test, assuming for argument's sake this court were to reverse and send it back, and defense says, you know what? In the five years between the last IBIS system and now, another million guns or pieces of evidence have been entered in the IBIS system. And then they have, again, additional. Is it new? We'd say that's not new evidence. It's a new evaluation of the same evidence. More importantly, is what does this evidence entail? The evidence we're saying is, again, the complex, a matter of smoke and mirrors. It is a fact that there was not a single photo among these myriad of micro photographs that were presented at the hearing that looked at a questioned piece of evidence and a test piece of evidence under the higher magnification. So the higher magnifications were available. It was not utilized on what the people's experts say are the only relevant evidence. Well, you don't know it was not utilized, do you? There's no photographs of it, but does that actually mean that it wasn't utilized? Well, there was no photographs or necessarily testimony relating to it. The defense argued at the end, we've shown you, Judge McGraw, of how the difference is. The newly discovered is not basically saying we're just reevaluating or reviewing the old evidence of the same magnifications. Did they say that they reviewed it and they did their comparison at 520 power? It's not completely clear. The testimony wasn't really clear what they looked at. They said, yeah, we looked at everything. And then when they revealed, well, what exactly did you look at? Well, here's, we're showing you. And they put up slides and show. All of those pictures were at, the only ones that were higher magnification was question to question or test to test of what we say are the fire-formed marks. To us, and again, the people's experts, that was the relevant difference. The relevant difference is only fire-formed marks, marks that are created only when you fire a gun. Breach face and firing pin marks are the only relevant marks. The extractor, ejector, and magazine lip marks, which are the only ones that were presented at the hearing, or pictures that presented at the hearing, that were at higher magnifications, are not relevant. Why? All experts agree that even the fire-formed marks, marks that are created when a gun is fired, can differ. Even if you would take a hundred bullets and test fire them, it is not, it's likely that you will get different fire-formed marks. Especially where, as in this case, the two casings were different materials from different manufacturers. Even more so, the non-fire-formed marks can be created without ever having fired a weapon. A defense expert even said, and again, a relatively simple illustration, if you take the magazine in which you insert a cartridge, depending on the amount of pressure you put in, if I were to put it in, it might be, marks might show or not show. If Justice McLaren were to put it in, who is, or in our, in the hypothetical, a much larger person. I use a loading device. Okay. If indeed, you know, Shaquille O'Neal were to put it in, the odds are there's going to be significantly different marks because he has a lot more strength than the pressure he puts it in. Our expert here, the third expert, Beth Penny, said, based on the findings of the defense experts, I went back and conducted eight additional test fires, and I cycled the bullet through with two bullets through without firing them. On both my test fires and those cycled bullets, I did find markings similar to both the question and the test fires, the earlier test fires. So the markings that supposedly were not found on the earlier bullets were reproduced by Ms. Penny. The defense could have requested leave to examine those. They never did. The defense, and we say it behooved them to include at least one high magnification picture. So let's get an 80 or 120 magnification of a fire form mark. I don't think you've mentioned the bullets yet, have you? I have not. To the extent that we're arguing obviously the difference, so the judge below, the defense arguing, the judge below also made a finding that it is arguably newly discovered because one of the state experts, Mr. Gunnell, changed his position on the bullets. At trial he had said they were different.  different. And then after the third people's expert said that the bullets as opposed to the shell casings were inconclusive, Mr. Gunnell reexamined them and said, I now agree. He explained why his finding was different. He said, I don't see the same things I saw in 1993. It's now 2012, I believe, 2013 that he reviewed it and said it looks different. And when asked to explain why it could be the case, he said the same reason why you sometimes see markings even on test fires in pristine conditions on some bullets that are fired and some that aren't, and that is that the soft material sometimes shows, sometimes doesn't. How could that relate to a change? And he said, it's soft metal. It can easily deteriorate. These bullets have been handled multiple times, multiple tests. There was at point in time, the record establishes that the evidence was sent back from the defense experts and was not sealed properly. There was no specific testimony as to what that meant. We don't know if they were sealed together and could have bumped into each other. We don't know if they were rubbed. But that was his explanation, was between that and the fact that there were at one point in time bodily fluids and stuff that could have deteriorated. And he explained that what I saw in 1993 and documented in my report is not the same that I see now. And I acknowledge that. We would say by analogy that's as if you had four eyewitnesses to an offense and at a subsequent hearing two witnesses retracted and said, you know what, I can't be sure that it's the person any longer. You still have the two eyewitnesses that are definitive. Is that a change sufficient to establish actual innocence? The people would assert that it is not.  It's not newly discovered. There was testimony, the jury heard testimony at trial. That from the defense experts said it was inconclusive. The people said included. Defense experts said inconclusive. So it doesn't change what the jury heard. It does change who that came from. Well, I mean, it is rather significant if the defense said at trial, which it did, I can't determine the state's at oil, et cetera. And now the state is going to say, I just can't. It's inconclusive. And now we have both sides saying the same thing. That seems pretty significant. It would be of utmost significance if that was all of the evidence. If it was both the bullets and cartridges, there's no dispute. I mean, the people I'm sure would have conceded below that a new trial is warranted. Let me rephrase that. I can't say for sure, but the odds are that would have been consideration. Two things. One, that wasn't the only evidence in the case. We had a crime stopper report that defendant had basically fessed up. We had his then-girlfriend who gave a police report and testified in front of the grand jury that tied. And then we had an individual that bought bullets and gave them to the defendant. So we had three ties of defendant to the gun, and we had two people tying defendant to both the gun and the offense. So that in itself is not even a lot closer case. But again, in my analogy, yes, of course it is a difference in that the we now have an inconclusive on the bullets, but we have at all points in time all three people's experts definitively stated that the cartridge cases were consistent throughout. In addition, and again, obviously it's... I'm sorry, consistently testified in identification throughout. The cartridge cases by all three of the people's experts, that never changed. Mr. Gunnell, Mr. McClain, and Ms. Caddy all consistently stated that the cartridge cases were tied to the gun. So even though Gunnell later stated the bullets that I said were tied are no longer, the cartridge cases were consistently identified as being tied to this gun all throughout. So trial, afterwards, and then Ms. Caddy. In addition, the people's concern is that when we're talking about a matter of identification or what a finding can be made by an examiner, generally a finding can be made of identify, it's this bullet or this casing, inconclusive or eliminated. The prevailing standard is that if you find class characteristics, it's a .45, it's from a certain manufacturer, you then go to a second level, and that is individual characteristics. The individual characteristics, as the people have argued, is, you know, should only be related to fire form, but regardless, there is no dispute that the defense experts said, I find that the individual characteristics exist, they're similar. They then went and said, but the coarseness, or the exact placement on, is a little different. So therefore, I can't find the quality and quantity to identify. May I briefly? You may briefly close. Are there any other questions? Closing, I'll save anything for rebuttal, but the people assert that the evidence, the relevant evidence before this Court, which should only be the fire form, which was not presented, is sufficient to reverse the lower court's finding. Mr. Murphy? Good morning, Your Honor. Good morning. And may it please the Court, my name is Kevin Murphy, and I represent defendant Patrick Pursley, who is present here in court today. In 1994, Mr. Pursley was convicted of a first-degree murder and sentenced to life in prison. Based largely on testimony from a firearm and tool-mark examiner, the two bullets and two cartridge cases found at the crime scene were a match with a firearm that was attributed to him, which I will refer to as the Taurus, to the exclusion of all other firearms. A new ballistics evidence from both the ISP and from defense examiners has now shown that that testimony was wrong. In December 2016, the Circuit Court Judge McGraw held a three-day evidentiary hearing at which he heard testimony from five firearm and tool-mark examiners, admitted over 50 exhibits, and considered countless images, digital images of the evidence in question, aided by the testimony of the defense examiners and the ISP examiners. Those digital images, were they more specific? Higher properties? It was undisputed. All examiners agreed that the digital images available now were not available at the time of the initial trial. Their higher definition images and also the microscopes have higher magnification and allowed pictures of that higher magnification. So in the original trial, what were the magnification was it 20? There was testimony that was up to 40 from the defense examiners. And so what did we have then in this three-day hearing? Up to 120 powering up. There were pictures of? There were pictures, contrary to the state's attorney's assertions, of both. And I want to address that first, because that's really important because the state asserts, first of all, that these other marks, ejector marks, extractor marks, and magazine lip marks, were not relevant to the conclusions of the defense examiners. But that is refuted completely by the record. Mr. Coleman, at the end of the state's cross-examination of him, was asked point-blank, were the ejector marks, extractor marks, and magazine lip marks that he viewed at 120 and 80 power, were these relevant to conclusions? And he said, yes, they were. And he also said that he marked in Mr. Murdoch's report all of the images that have had a material bearing on his conclusion. And if you look through Mr. Murdoch's report, several of the images at high power, at 120 and 80 power, of magazine lip marks and of extractor marks, are initialed by Mr. Coleman. It was clear from his testimony. And further, Mr. Murdoch addressed the State's position directly in his rebuttal argument. And what he said is here, the State's suggestion, effectively, Your Honor, is that perhaps some of the marks here were caused by some other gun, which is, it's worth noting, it's a concession that there are significant differences between the crime scene evidence and the test And Mr. Murdoch explained that here, we know that these marks on the test-fired cartridge cases are attributable to firing in the Taurus because they were fired under laboratory conditions, and they were clean, non-reloadable cartridge cases. So it's not as though these cartridge cases were fired in some other gun and then brought to a testing lab for test firing. And that's why Mr. Murdoch testified explicitly that here, these marks are of profound comparative value. What is the significance of non-reloadable? My understanding is that and Mr. Murdoch didn't testify explicitly on this, and I think he could probably explain it to you a lot better than I could, but that it cannot be loaded again into a firearm. And Your Honor, you may know better than me as to that, but this was Mr. Murdoch's testimony on that point. Is there any testimony that it was something other than brass? There were two crime scene cartridge cases. One was a brass cartridge case, and one was an aluminum cartridge case. And as to most of the test fires conducted in 1993 and 2011, I believe they used aluminum because it was one of the two metals that were found at the crime scene. Was the brass cartridge seen found at the scene? Was that non-reloadable? Your Honor, I'm not sure if that's in the record, and I don't recall off the top of my memory. But the important thing with the cartridge cases found at the scene, Your Honor, and this is something that the State argues at certain points in its briefing, that intercomparisons between two crime scene cartridge cases or two test fire cartridge cases are not relevant to the considerations and to the conclusions of the experts. But that's refuted directly by the testimony of our examiners. Mr. Murdoch and Mr. Coleman explained that this creates a benchmark of similarity that you would then expect to see when comparing the crime scene cartridge cases and bullets to the test fire ones. And they established that benchmark first, and then they see if that benchmark is present in between the question and test. And here they said that it wasn't. And there was one image in particular that I want to point out to Your Honors, because the State talks about how there were no high-magnification images of fire-related marks. And we disagree, and Mr. Coleman testified explicitly that these other marks are relevant. But even playing ball in the State's world and looking at just these marks, Mr. Murdoch testified. It was actually the image probably most testified about at the hearing. And it was image 35 in Mr. Murdoch's report. And we've included it for Your Honors at page 20 of the brief. And what this image shows is the two crime scene cartridge cases at 120 power. And Mr. Murdoch was able to zone in and see that the lines on this cartridge case line up nearly identically. And what that meant, Your Honors, is that whatever gun did fire these cartridge cases at the crime scene it left a very defined mark. And it was really noticeable on both of these cartridge cases. And Mr. Murdoch and Mr. Coleman then examined all of the test-fired cartridge cases for this mark and said that it was not impressive. And in the words of Mr. Murdoch, this is his words, there is no way that I can make that comparison and conclusion at 40 power. He used 120 power, Your Honors. And that's an important part. And I'd like to turn now to the fact that the state examiners and heard testimony from both the state examiners and Mr. Murdoch on all of these points and was able to assess the credibility of the state's examiners against the credibility of the new examiners on behalf of the defense. And it's worth noting, Your Honors, that Mr. Murdoch and Mr. Coleman have spent their careers testifying on behalf of law enforcement agencies against individuals like Mr. Pursley. And here testified on behalf of Mr. Pursley. And now, Your Honor, I've talked a lot about the newly discovered evidence as to count one, but I want to make sure it's clear to the court as we have in our briefing and as the state has failed to acknowledge that the circuit court granted relief on two separate counts. There was the opinions of Mr. Murdoch and Mr. Coleman on that none of the evidence could have been fired from the torts. And then there were the new opinions from the ISP examiners that the bullets cannot be identified to the torts in question. And this was a significant concession because what Mr. Ganell, the ISP examiner, testified to at trial is that both of these bullets are matched to this gun to the exclusion of all other firearms. And he described the markings on a bullet as akin to a fingerprint for a gun. And this allowed the state to argue a closing argument. They emphasized the fact that he identified both the bullets and both of the cartridge cases. And they said this isn't one match Mr. Ganell's made. It's four matches past positive. So if he is wrong, he is wrong four times. And we know now, John, that through his own admission that he was wrong twice and through the testimony of Beth Patti that he was wrong twice and the state's been talking about Mr. Ganell's explanation for how this evidence apparently degraded. Mr. Ganell's concocted explanation and inability to accept his wrong identification of these bullets in significant credibility because he admitted that he was aware of no scientific literature that would support this conclusion. And he admitted that he had never heard of a single case in which such degradation had actually happened. Now the state has talked about bodily fluids that it contends were present on the bullets, but Mr. Ganell said that at the time that it's always been his practice in examining bullets, as it is with other examiners, to clean off any such fluids prior to conducting an examination. So the idea that some fluid was left on these bullets that then degraded both of the bullets in a way that made them unidentifiable 20 years later is pure fabrication and is not credible. And the circuit court saw it as that. And, Your Honors, as to each of these counts, count one and count two, the state has not disputed in its opening brief or its reply brief any of the circuit court's findings as to count two. The circuit court found these new ISP opinions on the bullets were newly discovered, material and non-cumulative evidence that would be likely to lead to a different result on retrial. And the state hasn't challenged any of those. And we noted that for the state in our response brief, and in their reply brief, they still did not address these findings. And standing here before the court is the first time they've made a dispute as to these findings. And the reason for that is there's no basis to conclude that those findings were manifestly erroneous. The ISP opinions reached in this case as to the bullets were reached in 2011 and 2012. And indeed, although Mr. Gunnell reached new conclusions as to the bullets in 2012, and these conclusions were more favorable to Mr. Pursley, he did not even alert Mr. Pursley or Mr. Pursley's counsel to these conclusions until 2016 on the eve of the evidentiary hearing itself. So it would have been impossible for Mr. Pursley to have these conclusions at the time of his initial trial. And we've cited cases in our brief, Your Honor, that show that where a state examiner after the time of the trial provides testimony or an expert opinion that contradicts their trial testimony, that that's newly discovered evidence. And the circuit court's finding on this was not manifestly erroneous. The circuit court also found this evidence to be material and not cumulative. The evidence introduced at trial, and that was clearly the case. The only testimony at trial from the ISP was that both bullets matched to the exclusion of all other firearms. And now their testimony is that the bullets cannot be matched. Was the test cartridges the same manufacturer of the cartridges that were, or the empty cartridges that were found at the scene? I believe that, and this is just based on my recollection, Your Honor, that the test cartridges were the same as one of the two types of ammunition that was found at the scene of the crime. But importantly, these crime scene cartridge cases were intercompared despite having different metals and were found by all examiners, but in particular by Mr. Murdock and Mr. Coleman, to have reproducible markings despite the fact that they were fired, despite the fact that they were different metals. And then they were compared to the test fired cartridge cases and there were significant differences. And the circuit court sat there and heard as the ISP examiners admitted difference after difference in the cartridge cases and could not explain these differences. And this testimony, Your Honors, would be the legitimate of the State's case against Mr. Persley was this ballistics evidence. The State testified at closing argument that rejecting Mr. Goodell's opinion would be akin to a patient telling a doctor that he was wrong about an x-ray. That's how key this evidence was. And Mr. Murdock and Mr. Coleman, their new testimony refutes the State's conclusions decisively. And not only that, they explain in their testimony how at certain low magnifications some of these comparisons and some of these markings might appear similar but on the new higher power magnification microscopes that they had access to and that they used in this examination there are significant differences. In the words of Mr. Coleman, when ramping up the magnification, we could see that the marks were not in the same shape, they were not the same size, and they were not in the same orientation. Do we have the high magnification pictures of that information that you just gave us, where we can compare those? Yes, Your Honor. On each of them or on just some of them? So what the experts testified, Your Honor, was that the examination process is dynamic and it constantly involves changing the view and changing the configuration and the lighting. And so what the images do is they're simply illustrative of the work that they do. And yes, there are images at 120 and 80 power of fire-related marks, marks on the firing pin aperture bulge, and also extractor marks and magazine lip marks that document the fact that Mr. Murdoch and Mr. Coleman examined this evidence and reached their conclusions based on this newly discovered technology. I don't have Justice McClaren's knowledge, and so the thing that and maybe you can answer this, maybe it was answered, how can we have two casings with different metals coming from the same one? Because the cartridge cases can still, and Justice McClaren, I can let you take that if you'd like. No, I didn't ask Justice McClaren. But they can still, although they're made from different metals, that they're of the same caliber and they can still be fired in the same gun despite being made of different metals. Would they be the same manufacturers? I don't believe that they were, Your Honor. They could be the same manufacturer. It depends. Many manufacturers make steel case cartridges and they also make brass cartridges. Some are Teflon coated steel cartridges. But if it fits in the magazine, the gun will shoot it. Mr. Murphy, let me ask you something as it pertains to the issue of whether this is likely to change the result upon retrial. If the newly discovered evidence, let's say it was a DNA test, would you agree with me that that is qualitatively of much greater significance and much greater certainty than the opinion of an expert witness which is based on his training, his observations, his examination of evidence that's 20 years old, would you agree with me that there is a much greater certainty and greater significance to the evidence, let's say, of DNA testing? Your Honor, certainly I don't think that ballistics examination is the same as DNA examination. And I know that in DNA cases now you see the chances of an ARV1 in 4 quadrillion or something like that. And I don't think that's precisely what ballistics examination is. But the key is that ballistics examination, when it's done properly and using the highest available technology, can be very precise. And that's what we've seen from Mr. Murdock and Mr. Coleman. It will never approach the significance and the quality of, let's say, DNA evidence, would you agree with that? Because it depends upon someone's opinion as opposed to the scientific results of the test. I think you're right that DNA inherently has a little bit more persuasive value. But I don't think it's a significant difference, especially when you have examinations done by examiners that are thorough and attentive to detail and using the best available technology. I'm assuming that that's something that Judge McGraw considered. Yes, Your Honor. And that's the final point I'd like to end with just briefly is the Circuit Court Judge McGraw heard the testimony of all the examiners. He was in the unique position of being able to assess the impact that Mr. Murdock and Mr. Coleman's testimony would have and also the impact that the ISP examiner's testimony would have on a jury at retrial. Mr. Murdock and Mr. Coleman explained to the Court at length these differences with a giant screen next to him pointing out to Judge McGraw these differences and why they were significant. And he weighed that evidence and he weighed the impact that it would likely have on a jury. His findings are entitled to deference for this Court and this Court should affirm. Thank you, sir. Thank you, Your Honor. Mr. London. Your Honors, the defense position is exactly what they are on below and it's our concern that they're doing the same thing here and that is again a little bit of smoke and mirrors. We've included, so you don't need to take my word or a defense counsel's word, of what the evidence and what the micro-pictures showed. We've attached it to our brief. It's Mr. Murdock's report. We did not say that they didn't take any high-definition pictures of breach face or i.e. fire-form marks. What we said was they took no pictures of the fire-form marks comparing a question to a test. That is on A5 of our reply brief. It's Mr. Murdock's report, Exhibit 8, Exhibit C. There are only six pictures taken into comparing a test fire to a question. The highest magnification was at 30 magnification. Why did they take a single picture of a fire-form mark from a test to a question? The reason is we believe that it would show that indeed the marks of the fire-form are similar. Beth Patty testified not only did that not occur, but she testified that in her test fires she did find extractor, ejector and or lit marks that were similar and Beth Patty was the only one that used different manufacturers and different materials and metals. She didn't just use aluminum bullets in test fires. She tried all of them based on Murdock's report. Secondly, this is not a credibility question. I'm sorry. Aluminum cartridges. Yes, I do apologize. Bullets, cartridge cases and shell casings are all different. Perhaps most importantly, under the prevailing standard, if you find class characteristics, which everyone, there's no dispute, and if you find similar individual characteristics, you cannot reach a finding of excluded. You can reach a finding of inconclusive. So the people are saying that the defense experts, people's experts said not only do you disagree on equality and quantity, but more importantly, we disagree that under the prevailing standard anyone could have excluded these bullets. At most, you could find inconclusive. Why? Characteristics that are the same, individual characteristics that are similar can only lead to an inconclusive. If this Court is to find that the non-fire-form marks are relevant and sufficient to establish that it's newly discovered evidence, then the people agree they probably will lose. If this Court were to find that despite the lower court's finding that it is only the fire-form marks that are relevant, then there is no newly discovered evidence. Why? Because there is no picture that compares the question to the test fires. There is not a single picture at any magnification that was not available at the time of trial. Well, if we can do these cases without evidence, why don't we just always have pictures and make a decision? I'm sorry? If we can, you know, if these decisions can just be made on pictures, if we can just present a, I'll say, a bunch of pictures to a jury and say, okay, you decide. Well, because obviously you need the interpretation of the experts and we understand that. Okay. But the experts interpret in their pictures. They say, this picture highlights our finding. And we show you at the 120 the newly available magnifications of a fire-form mark, but that's test-to-test or it is question-to-question. What they needed to do, and this is where the people argue is exactly the case. This is the smoke and mirrors. They don't have a single test to a single question at higher magnification. Were there any non-fire-form marks on the test cartridges? Yes. Certainly. And although those were not necessarily, again, Beth Petty testified that on her additional, those were not consistent. Would you like me to complete that thought? You can finish it. Those were not consistent. On her new test-form marks, yes, there were indeed extractor, ejector, and lip marks. Some reproduced and were consistent with each other. Some were not. She was the only one that used different manufacturers and different metals. She also said, though, that she found some on her test that were consistent with both the earlier tests and the earlier questions. So the marks that Murdoch and Coleman did not find at the higher magnification, Patty found on her test fires. So Patty never put a cartridge in the magazine, had it slam in the battery, and then pulled the slide back? Yes, she did. She had eight test fires and two non- test fires. She pulled two bullets through and examined them. The non-test fires were non-fire-formed. Correct. I thought you said that there were no non-fire-formed cartridges. No, I did not say that. If I did, I apologize. What I said was there was no high magnification comparison between a non-fire-formed question and test. Indeed, there were two bullets that Patty testified to. I'm sorry. Two cartridge cases that Patty testified to. Ten total. Eight were fire-formed and they were both fire-formed and non-fire-formed marks. Two were merely cycled through, were not fired, and she testified as to those ten. Not all the marks were consistent. Some were, but there were also marks on her tests that were consistent with the question bullets. And the originals, they were never put into the gun and then pulled, or the slide pulled and ejected and then examined. The original? Yes. I don't know why they would do it because it would affect the integrity of the cartridge, but I'm asking you just in case. Correct. They were not, we don't know if they were done originally, if they were taken from another gun, but they certainly, that would obviously taint the evidence. For these reasons, we believe that the trial court judge is finding this manifestly erroneous and we ask this court to reverse. Thank you. Thank you. We'll take a recess for lunch.